E-FILED; Anne Arundel Circuit Court
Docket: 3/1/2019 4:19 PM; Submission: 3/1/2019 4:19 PM

## IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

| | | |
|---|---|---|
| **VINCENT HARDICK**<br>932 Placid Court<br>Arnold, Maryland 21012 | : | |
| Plaintiff | : | |
| **v.** | : | Case No. C-02-CV-19-000671 |
| **BYTEGRID MANAGEMENT SERVICES LLC** | : | |
| <u>Serve on:</u><br>The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801 | : | |
| and | : | |
| **BYTEGRID HOLDINGS LLC** | : | |
| <u>Serve on:</u><br>The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801 | : | |
| Defendants. | : | |

## COMPLAINT AND JURY DEMAND

COMES NOW, Plaintiff Vincent Hardick, by and through undersigned counsel Timothy F. Maloney, Alyse L. Prawde, and Joseph, Greenwald & Laake, P.A., and files this Complaint against Defendants ByteGrid Management Services LLC and ByteGrid Holdings LLC, and for cause states as follows:

## INTRODUCTION

1

Plaintiff Vincent Hardick was employed as the Senior Vice President for Hosting Operations for Defendants ByteGrid Management Services LLC and ByteGrid Holdings LLC until he was wrongfully terminated on May 3, 2018. When new management started, they concocted a scheme to terminate Mr. Hardick "for cause" in an effort to avoid paying him his severance. There was no "cause" for Mr. Hardick's termination.

The reasons given by Defendants for terminating Mr. Hardick were pretext for Defendants' refusal to pay him the severance in which he is legally entitled. Defendants have breached their agreement with Mr. Hardick in terminating him "for cause" when no such cause existed and for subsequently failing to pay him the severance he is owed.

The employment agreement signed by Mr. Hardick when he started working for Defendants in 2015 purports to impose oppressive and overly broad restrictions on Mr. Hardick's post-employment activities, including restrictions that would substantially interfere with his ability to earn a living. These non-compete and non-solicitation provisions are not designed or intended to protect any legitimate or lawful business interests. Rather, these restrictive covenants were designed to interfere with Mr. Hardick's legitimate right to seek employment and to suppress fair competition.

Mr. Hardick seeks a declaratory judgment that the post-employment restrictive covenants in his employment agreement are unenforceable on their face because they are overbroad, unreasonable, and not designed to protect any legitimate or lawful business interest. He also seeks a preliminary and permanent injunction against the enforcement of these restrictive covenants.

## JURISDICTION AND VENUE

2

1.      This Court has jurisdiction under § 6-102 through § 6-103 of the Maryland Code
Annotated, Courts and Judicial Proceedings Article. Defendants regularly carry on and transact
business in the State of Maryland.

2.      Venue is proper pursuant to § 6-201 and § 6-202 of the Maryland Code
Annotated, Courts and Judicial Proceedings Article.

## PARTIES

3.      Plaintiff Vincent Hardick is the aggrieved party, is an adult citizen of the State of
Maryland, residing at 932 Placid Court, Arnold, Maryland 21012.

4.      Defendant ByteGrid Management Services LLC is a Delaware limited liability
company with its principal place of business located at 1800 Tysons Boulevard, Suite 350,
McLean, Virginia 22102.

5.      Defendant ByteGrid Holdings LLC is a Delaware limited liability company with
its principal place of business at 1800 Tysons Boulevard, Suite 350, McLean, Virginia 22102.

## FACTS COMMON TO ALL COUNTS

### *Plaintiff's Employment with ByteGrid*

6.      Plaintiff Vincent Hardick began working for Defendants ByteGrid Management
Services LLC and ByteGrid Holdings LLC on March 4, 2015, after selling his company, Sidus
Group, LLC, to ByteGrid Holdings LLC. Upon selling Sidus Group to Defendants, Mr. Hardick
became Defendants' Vice President for Hosting Operations.

7.      Mr. Hardick had founded Sidus Group, LLC, a web-hosting firm based in Anne
Arundel County, in 1999. He served as Sidus Group's Chief Technology Officer and led the
design and implementation of a Class A data center in Annapolis, Maryland. Sidus provided

3

cloud hosting, managed hosting, and IT regulatory consulting services to federal, state, and local agencies, as well as pharmaceutical, health care, and biotechnology companies.

8.      In 2014, the Sidus Group entered into a contract with the Maryland State Board of Elections to provide the network for all elections in the State.

9.      On March 4, 2015, Mr. Hardick entered into an Employment Agreement with Defendant ByteGrid Management Services, Inc., whose name has since changed to ByteGrid Management Services LLC. A copy of the Employment Agreement is attached as Exhibit 1.

10.     Defendants provide IT hosting infrastructure to companies and organizations around the world. Defendants' have four data centers: two are in Maryland (Annapolis and Silver Spring), one is in Illinois, and one is in Washington. Mr. Hardick worked out of Defendants' office in Annapolis.

11.     In 2015, Defendants entered into a $7.6 million contract with the State Board of Elections. As part of this agreement, Defendants host the statewide voter registration, candidacy, and election management system; the online voter registration system; the online ballot delivery system; and the unofficial election night results website.

12.     In addition to the State Board of Elections, ByteGrid provides services to agencies and organizations across North America, such as the U.S. Department of Labor, hospital systems, and biotechnology and pharmaceutical companies.

13.     ByteGrid Holdings LLC is owned by a Russian-financed firm, AltPoint Capital Partners. The largest investor to AltPoint Capital Partners is Vladimir Potanin, a Russian oligarch, and its fund manager is Russian. Upon information and belief, the State Board of Elections was unaware that ByteGrid was owned by a Russian investor until early July 2018.

14.     As the Senior Vice President for Hosting Operations, Mr. Hardick oversaw most of the Defendants' Network Operations Center employees. He also led the security and network for the State Board of Elections before, during, and after elections. The State Board of Elections regularly consulted with Defendants about security to its systems and yearly audits, and Mr. Hardick led those efforts.

### Defendants unlawfully terminated Mr. Hardick "for cause"

15.     In January 2018, Defendants began replacing the C suite executive staff. These terminations appeared to be directed from Altpoint. These C suite executives were pushed out and/or terminated with minimal severances in violation of their previously negotiated severance agreements.

16.     On May 3, 2018, Defendants terminated Mr. Hardick's employment pursuant to Section 6(c) of the Employment Agreement. Defendants based Mr. Hardick's "for cause" termination on an allegation that Mr. Hardick knew or should have known that a senior executive was acting in opposition to the Defendants' policies and Mr. Hardick did not report the conduct.

17.     Specifically, Defendants' former president and Chief Information Officer, Jason Silva, had purchased two bitcoin miners that Defendants were technically assessing. These bitcoin miners were approved by Defendants' former Chief Executive Officer, Michael Duckett. Mr. Duckett was aware of the miners that were being stored in the Annapolis data center.

18.     Defendants' current Vice President, Kevin Tecker, was also aware of the miners and participated in the research of the bitcoin miners operations. Numerous other ByteGrid employees were aware of the operation of the bitcoin miners and participated in the provisioning, operation, and research into the devices.

19.     Shortly after the bitcoin miners were purchased, Defendants were overwhelmed with requests for bitcoin miner services. Given this influx in requests, and without knowing the cost basis, Defendants conducted a study to determine the cost basis for offering these services. Mr. Hardick had no involvement in the study, as his work was instead focused on the production operations of client services.

20.     The new CEO, William Schrader, falsely accused Mr. Hardick of colluding to steal resources by allowing this study to continue. Mr. Hardick was also accused of not reporting this testing to the Board of Directors, even though he had never spoken to the Board in the entirety of his employment and had no direct access to the Board. This testing had been approved by former-CEO Michael Duckett and other executives senior to Mr. Hardick.

21.     Defendants further contended that they terminated Mr. Hardick "for cause" because they falsely accused him of misusing company resources. Defendants asserted that Mr. Hardick had permitted an unwritten employee practice to continue that was against Defendants' policies and which he did not report. Defendants asserted that Mr. Hardick had allowed an engineer to have a test server used for his own purposes of development and engineering at Defendants' data center but because not all employees were permitted to do this, an imbalance was created.

22.     Mr. Hardick did not dictate any formal policy as to whether employees could use Defendants' development or testing platforms for personal research, testing, or development. Rather, Defendants' CEO, President, and Chief Technology Officer approved those uses. This practice was approved by Defendants' C Level executives and this practice was common place for any employee who wanted to take advantage of it. At no time did this practice affect Defendants' production. Many ByteGrid engineers on the Technical Support and engineering

6

teams were encouraged to have their own testing servers to learn the existing ByteGrid systems and to further their knowledge of server administration and engineering.

23.     Mr. Hardick's role at ByteGrid was not to make policy or to authorize use of development servers for the technical staff. In fact, the practice of allowing engineers to have their own development servers was a well-established policy and perk at ByteGrid that existed before Mr. Hardick joined the company.

24.     These "reasons" to terminate Mr. Hardick "for cause" are in actuality false and just pretext to terminate Mr. Hardick without having to pay him a one-year severance, which he has a right to under ¶ 6(b) of the Employment Agreement.

25.     Paragraph 6(b) of the Employment Agreement provides, in relevant part, that if Mr. Hardick is terminated without cause, he is to receive the following severance: "In addition, Executive shall receive (so long as Executive is not in breach of any provision of this Agreement) an amount equal to 100% of his then full annual Base Salary (the "Severance Payment"), to be payable over a period of twelve (12) months (the "Severance Period") and in accordance with the Company's then-existing payroll practices with respect to senior management."

26.     Mr. Hardick does not meet any of the definitions of "cause" as set forth in the Employment Agreement. Paragraph 6(e) defines "cause" as:

i.      Any act or omission by Executive constituting gross negligence or willful misconduct of Executive in the performance of his duties which, in the reasonable judgment of the Board, is materially injurious to the financial condition, business or reputation of the Company;

ii.     Executive's material breach of any provision of this Agreement (*provided* that, except with respect to habitual or repeated breaches, if any alleged breach is capable of being cured, Executive shall not be considered in breach unless he shall have failed to cure such alleged breach within ten (10) Business Days

7

following the delivery of written notice thereof from the company, stating the reason for such termination for Cause);

iii.    Any act or omission by Executive constituting fraud, embezzlement or dishonesty against the Company;

iv.    Use of illegal drugs or repetitive abuse of other drugs or repetitive excess consumption of alcohol interfering with the performance of Executive's duties; and/or

v.    Executive's conviction of, or pela of guilty or *nolo contendere* to, any felony or act of moral turpitude which, in the reasonable judgment of the Board, is materially injurious to the financial condition, business or reputation of the Company or any of its Affiliates.

(Ex. 1, Employment Ag., ¶ 6(e)).

27.    The decision to terminate Mr. Hardick came as a result of a new management team appointed by Defendants. In March 2018, Mr. Duckett was replaced by William Schrader as Chairman, Chief Executive, and President. Around this time, Defendants' owner, AltPoint Capital Partners, terminated all C-Level Executive staff and sales directors and replaced them with individuals who are unaware how to run the day-to-day operations of ByteGrid. AltPoint also replaced some members of ByteGrid's Board of Directors with individuals who, upon information and belief, have ties to the Russian Government.

28.    The effort to terminate Mr. Hardick "for cause" was an attempt to avoid having to pay him the severance he would otherwise be entitled to if he was terminated without cause.

29.    Defendants further terminated Mr. Hardick, in part, to avoid meeting standards as part of their contract with the Maryland State Board of Elections.

30.    There was no cause for Mr. Hardick's termination. He was not grossly negligent or engaged in any willful misconduct in a way that was materially injurious to Defendants' financial condition, business, or reputation; he did not materially breach any provision of the Employment Agreement nor was he provided with any notice of any alleged breach; he did not

8

commit fraud, embezzlement, or dishonesty against Defendants; he did not abuse illegal drugs; and he did not engage in any criminal activity.

### *The restrictive covenants are overly broad and unenforceable*

31.  Section 7 of the Employment Agreement sets forth restrictive covenants, including a non-competition and non-solicitation provisions, which Defendants purport Mr. Hardick is now bound. The non-competition clause provides:

(a) <u>Non-Competition.</u> Executive agrees that during his employment with the Company and, subject to Section 7(g), the Severance Period, as extended (the "Covenant Term"), he will not: (i) on his own behalf nor, directly or indirectly, as principal, agent, partner, member, shareholder, consultant, financier or employee, work for, provide consulting services to, act as a financier to, or otherwise provide services to, any person, entity, firm, corporation or business establishment in the Territory (as defined below) which competes with the Company or ByteGrid Holdings or any of their respective affiliates or subsidiaries (each individually a "Company Group Member" and collectively, the "Company Group") in the Business (as defined below); (ii) directly or indirectly, solicit, interfere, influence, hinder, hamper or impede, or seek to interfere, influence, hinder, hamper or impede existing or potential business relationships between any Company Group Member and any person, entity, customer, client or supplier having a relationship with any Company Group Member during the Covenant Term.

For purposes of this Agreement, the term "Business" shall mean the business of providing scalable data center, interconnection, consulting, and professional services, including, but not limited to, wholesale and retail colocation rackspace solutions, cloud platforms and services, dedicated and managed hosting services, infrastructure services, backup and database storage solutions, disaster recovery services, and compliance and quality management services, as being conducted by the ByteGrid Holdings, the Company and any Company Group Member. The term Business shall also include any other business in which any Company Group Member were engaged or planning to be engaged during Executive's employment with the Company; *provided,* that (A) the Company can demonstrate any such Company Group Member was planning to be engaged in a business through written materials (for example, strategic plans, Board materials, minutes of Board meetings, etc.) and (B) Executive knew or should have known of such plans as a result of his employment with the Company.

For purposes of this Agreement, the term "Territory" shall mean North America.

(Ex. 1, Employment Ag., ¶ 7(a)).

32. The Employment Agreement provides the following customer non-solicitation provision:

> (c) Non-Solicitation of Customers. Executive agrees that during his employment with the Company and subject to Section 7(g), for a period of two (2) years following the termination of his employment, he will not, directly or indirectly, solicit, cause any other person to solicit, or assist any other person with any Company Group Member or any potential customer or client of any Company Group Member with whom any of such parties has had discussions to become a customer or client of another entity which is in direct or indirect competition with the any Company Group Member. This subsection is limited to the extent Executive knows or should have known that such potential customer or client is, in fact, a potential customer or client.

(Ex. 1, Employment Ag., ¶ 7(c)).

33. The Notice of Termination that Defendants presented to Mr. Hardick provides that he "shall remain bound by, and subject to the terms of, the Restrictive Covenants (Non-Solicitation, Confidentiality, Non-Disparagement and so forth) contained within (i) the Employment Agreement" and other agreements.

34. These restrictions are not designed or intended to protect Defendants' legitimate and lawful business interests. Instead, they are designed and intended, and/or are being used improperly, to intimidate former employees like Mr. Hardick and interfere with their legitimate rights to seek alternative employment.

## COUNT I
### Wrongful Discharge

35. Plaintiff re-alleges and incorporates by reference all the factual allegations herein as if specifically listed herein again.

36. Plaintiff Vincent Hardick worked for Defendants ByteGrid Management Services LLC and ByteGrid Holdings LLC from March 4, 2015, until he was wrongfully discharged on May 3, 2018.

10

37.     Defendants began terminating and/or replacing the C suite executive staff, including Mr. Hardick, at the direction of Altpoint. These employees were pushed out and/or terminated with minimal severances in violation of their previously negotiated severance agreements.

38.     Mr. Hardick at all times had fully and competently performed the duties assigned to him.

39.     Mr. Hardick's termination was wrongful and without any cause whatsoever, as it resulted in an attempt by Defendants, as directed by Altpoint, to avoid meeting standards as part of their contract with the Maryland State Board of Elections and in an attempt to avoid paying Mr. Hardick the severance that he had negotiated with Defendants.

40.     The avowed public policy of the State of Maryland is that employers shall not terminate employees for pretextual reasons to avoid paying employees the severance for which they have contracted.

41.     The sole basis for Mr. Hardick's termination was to avoid complying with the contract with the State Board of Elections and to avoid paying Mr. Hardick his severance. Any other proffered basis for his discharge was pretextual.

42.     Defendants' conduct in terminating Mr. Hardick was deliberate, malicious, willful, and intentionally calculated to inflict harm upon him.

43.     As a result of Defendant's actions, Mr. Hardick was left without employment for a period of several months, deprived of his annual salary, and has suffered and will continue to suffer harm to his reputation, mental anguish, emotional distress, shame, and embarrassment.

WHEREFORE, Plaintiff Vincent Hardick sues Defendants for cause and respectfully demands that: (a) Judgment against Defendants, jointly and severally, in an amount exceeding

seventy-five thousand dollars ($75,000), plus interest, punitive damages, and costs; and (b) this Court award Plaintiff such other relief as the Court deems just and proper.

## COUNT II
**Breach of Contract**

44.     Plaintiff re-alleges and incorporates by reference all the factual allegations herein as if specifically listed herein again.

45.     On or about May 4, 2015, Defendant ByteGrid Management Services LLC, then called ByteGrid Management Services, Inc., entered into an employment agreement with Mr. Hardick which governed his employment with Defendants.

46.     On May 3, 2018, Defendants terminated Mr. Hardick's employment "for cause," claiming that Mr. Hardick knew or should have known that a senior executive was acting in opposition to Defendants' policies and that he allowed employees to use development or testing platforms for personal research and development.

47.     These reasons to terminate Mr. Hardick "for cause" were merely pretextual.

48.     Section 6(e) of the Employment Agreements defines "cause" as:

   i.    Any act or omission by Executive constituting gross negligence or willful misconduct of Executive in the performance of his duties which, in the reasonable judgment of the Board, is materially injurious to the financial condition, business or reputation of the Company;

   ii.   Executive's material breach of any provision of this Agreement (*provided* that, except with respect to habitual or repeated breaches, if any alleged breach is capable of being cured, Executive shall not be considered in breach unless he shall have failed to cure such alleged breach within ten (10) Business Days following the delivery of written notice thereof from the company, stating the reason for such termination for Cause);

   iii.  Any act or omission by Executive constituting fraud, embezzlement or dishonesty against the Company;

iv.   Use of illegal drugs or repetitive abuse of other drugs or repetitive excess consumption of alcohol interfering with the performance of Executive's duties; and/or

v.    Executive's conviction of, or pela of guilty or *nolo contendere* to, any felony or act of moral turpitude which, in the reasonable judgment of the Board, is materially injurious to the financial condition, business or reputation of the Company or any of its Affiliates.

(Ex. 1, Employment Ag., ¶ 6(e)).

49.    Mr. Hardick has not met any of the definitions of "cause" as set forth in the Employment Agreement.

50.    Paragraph 6(b) of the Employment Agreement provides, in relevant part, that if Mr. Hardick is terminated without cause, he is to receive a severance.

51.    Because there was no "cause" to terminate Mr. Hardick, he is entitled to the severance set forth in the Employment Agreement, which is his base salary of $220,000.

52.    Defendants materially breached the Employment Agreement when they purported to terminate Mr. Hardick for "cause" when in actuality there was no cause for his termination and when they failed to pay him the severance payment he is entitled to under the Employment Agreement.

53.    Mr. Hardick did not breach the Employment Agreement.

WHEREFORE, Plaintiff Vincent Hardick sues Defendants for cause and respectfully demands that: (a) Judgment against Defendants, jointly and severally, in an amount exceeding seventy-five thousand dollars ($75,000), plus interest, punitive damages, and costs; and (b) this Court award Plaintiff such other relief as the Court deems just and proper.

**COUNT III**
**Declaratory Judgment – Restrictive Covenants**
**(Plaintiff v. Defendants)**

54.     Plaintiff re-alleges and incorporates by reference all the factual allegations herein as if specifically listed herein again.

55.     This declaratory judgment action is brought pursuant to Md. Code, Cts. & Jud. Proc. §§ 3-406 and 3-407 for the purpose of determining questions of actual controversy between the parties and terminating uncertainty and controversy giving rise to this proceeding.

56.     There exists an actual controversy between Plaintiff and Defendants as to the whether the non-solicitation or noncompetition agreements between Plaintiff and Defendants are enforceable under the law or whether they are unreasonable and voice as against public policy or are otherwise unenforceable.

57.     It is within the Court's discretion to enter a declaratory judgment in this matter concerning the dispute between Plaintiff and Defendants concerning Plaintiff's contractual obligations, if any, to Defendants.

58.     Such declaratory judgment will serve to terminate the uncertainty or controversy giving rise to this lawsuit.

59.     Plaintiff is entitled to a declaratory judgment that the post-employment restrictive covenants in the agreement with Defendants are overbroad and not designed to protect the legitimate and lawful interests of the former employer or are otherwise unenforceable under the applicable law and are against public policy and should therefore be found unenforceable.

WHEREFORE, Plaintiff Vincent Hardick respectfully demands that: (a) The Court issue a declaratory judgment that the non-compete and client non-solicitation provisions in the Employment Agreement are unreasonable and void as against public policy; (b) the Court issue injunctive relief ordering Defendants to take any and all appropriate actions to recognize that the

non-compete and client non-solicitation provisions are unenforceable; and (c) the Court award

Plaintiff such other and further relief as in law and justice he may be entitled to receive.

## COUNT IV
### Declaratory Judgment - Termination
### (Plaintiff v. Defendants)

60.     Plaintiff re-alleges and incorporates by reference all the factual allegations herein

as if specifically listed herein again.

61.     This declaratory judgment action is brought pursuant to Md. Code, Cts. & Jud.

Proc. §§ 3-406 and 3-407 for the purpose of determining questions of actual controversy between

the parties and terminating uncertainty and controversy giving rise to this proceeding.

62.     There exists an actual controversy between Plaintiff and Defendants as to whether

Plaintiff was terminated "for cause."

63.     Plaintiff and Defendants entered into an Employment Agreement on March 4,

2015.

64.     The Employment Agreement defines "for cause" as:

    i.    Any act or omission by Executive constituting gross negligence or willful misconduct of Executive in the performance of his duties which, in the reasonable judgment of the Board, is materially injurious to the financial condition, business or reputation of the Company;

    ii.    Executive's material breach of any provision of this Agreement (*provided* that, except with respect to habitual or repeated breaches, if any alleged breach is capable of being cured, Executive shall not be considered in breach unless he shall have failed to cure such alleged breach within ten (10) Business Days following the delivery of written notice thereof from the company, stating the reason for such termination for Cause);

    iii.    Any act or omission by Executive constituting fraud, embezzlement or dishonesty against the Company;

    iv.    Use of illegal drugs or repetitive abuse of other drugs or repetitive excess consumption of alcohol interfering with the performance of Executive's duties; and/or

v.      Executive's conviction of, or pela of guilty or *nolo contendere* to, any felony or act of moral turpitude which, in the reasonable judgment of the Board, is materially injurious to the financial condition, business or reputation of the Company or any of its Affiliates.

(Ex. 1, Employment Ag., ¶ 6(e)).

65.     On May 3, 2018, Defendants provided Plaintiff with a letter stating he was being terminated pursuant to § 6(c) of the Employment Agreement – "Termination by the Company for Cause."

66.     The effort to terminate Mr. Hardick "for cause" was an attempt to avoid having to pay Mr. Hardick a one-year salary as part of his severance.

67.     There was no cause for Mr. Hardick's termination. He was not grossly negligent or engaged in any willful misconduct in a way that was materially injurious to Defendants' financial condition, business, or reputation; he did not materially breach any provision of the Employment Agreement nor was he provided with any notice of any alleged breach; he did not commit fraud, embezzlement, or dishonesty against Defendants; he did not abuse illegal drugs; and he did not engaged in any criminal activity.

68.     There therefore exists an actual controversy concerning justiciable issues between Plaintiff and Defendants within the jurisdiction of this Court, involving the issue of whether Plaintiff was terminated for cause by Defendants.

69.     Such declaratory judgment will serve to terminate the uncertainty or controversy giving rise to this lawsuit. Under §§ 3-401 through 3-415 of the Courts and Judicial Proceedings Article, Plaintiff is entitled to a judgment declaring the rights and responsibilities of the Plaintiff and Defendants and further settling the legal relations, rights, and responsibilities of the parties.

WHEREFORE, Plaintiff Vincent Hardick respectfully demands that: (a) The Court issue a declaratory judgment that Plaintiff was not terminated "for cause" by Defendants; (b) the Court issue injunctive relief ordering Defendants to take any and all appropriate actions to recognize that Plaintiff was not terminated "for cause"; and (c) the Court award Plaintiff such other and further relief as in law and justice he may be entitled to receive.

Respectfully submitted,

By:   /s/  Alyse L. Prawde
Timothy F. Maloney, CPF#8606010245
Alyse L. Prawde, CPF#1412180033
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 (phone)
(301) 220-1214 (fax)
tmaloney@jgllaw.com
aprawde@jgllaw.com

*Attorneys for the Plaintiff*

[[EXECUTION VERSION]]

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("**Agreement**"), is made and effective as of this ____ day of _____, 2015, by and between **BYTEGRID MANAGEMENT SERVICES, INC.**, a Delaware corporation (the "**Company**"), and **VINCENT HARDICK**, an individual residing at 932 Placid Court, Arnold, MD 21012 ("**Executive**" and together with the Company, the "parties").

In consideration of the facts, mutual promises and covenants contained herein, and intending to be legally bound hereby, the parties hereto agree as follows:

1.      Employment and Term.

(a)     Employment. The Company hereby agrees to employ Executive, and Executive hereby agrees to accept such employment with the Company, all upon the terms and conditions set forth in this Agreement, subject to termination as provided herein.

(b)     Term. The initial term of employment of Executive under this Agreement shall begin as of the date hereof (the "**Effective Date**") for an initial term ending on the first anniversary of the Effective Date (such period, the "**Initial Term**"), subject to the provisions for termination set forth herein and renewal as provided in Section 1(c) below.

(c)     Renewal. Unless either party shall have given the other notice that this Agreement shall not be renewed at least sixty (60) days prior to the end of the Initial Term, the term of this Agreement shall be automatically extended for additional consecutive periods of one year each, such procedure to be followed in each such successive period (any such extended term together with the Initial Term, the "**Term**"). Each extended term shall continue to be subject to the provisions for termination set forth herein.

2.      Office and Duties.

(a)     Executive shall serve as the Senior Vice President of Cloud Services, and shall report directly to the President of Cloud Services of the Company. Executive shall be subject to the supervision, control and direction of the President, CEO, or as otherwise directed by the Board of Directors (the "**Board**") of ByteGrid Holdings LLC ("**ByteGrid Holdings**").

(b)     In his capacity as Senior Vice President of Cloud Services, Executive shall have such authority, perform such duties and discharge such responsibilities as are customary to and consistent with his position, and render such services as are customary to and consistent with his position, subject to the authority and direction of the President, and Executive shall perform such additional lawful duties and responsibilities as may be from time to time reasonably assigned to him by the Chief Executive Officer and President.

(c)     Executive acknowledges and agrees that he shall observe and comply with all of the Company's lawful policies and procedures, and comply with all directives of the Board.

(d)     Executive's principal place of employment shall be the Company's office at 175 Admiral Cochrane Drive, Suite 301, Annapolis, MD 21401 (the "**Office**") and the Company shall ensure that Executive has appropriate office space in the Office. It is further understood and acknowledged by Executive and the Company that the performance of Executive's duties may require travel to evaluate additional business and sales opportunities across the United States. Aggregate travel days shall not exceed 90 days per Term year.

(e)     Executive hereby agrees to devote substantially all of his time, efforts and energies to the business of the Company, to faithfully perform any and all duties reasonably assigned to him by the President and CEO, and to use his best efforts to advance the business and welfare of the Company.

(f)     While employed by the Company, Executive shall not be engaged in any business activity which, in the reasonable judgment of the Board, conflicts with Executive's duties hereunder, whether or not such activity is pursued for pecuniary advantage.

3.     At-Will Employment. Notwithstanding anything in the foregoing to the contrary, Executive understands and acknowledges that his employment with the Company is "at-will" which means that either Executive or the Company may terminate the employment relationship and this Agreement at any time, for any reason, including with or without Cause (as defined herein), subject to the provisions set forth in this Agreement, including Section 6; Executive further understands and agrees that except as otherwise provided herein, and subject to Section 7(g), the restrictive covenants contained in Section 7 below will continue in full force and effect after the termination of Executive's employment regardless of whether his termination was voluntary or involuntary, regardless of the reason for the termination, and regardless of whether Executive has any claim against the Company. Nothing in this Agreement shall be construed as a guarantee of employment for any specific period of time.

4.     Compensation.

(a)     Base Salary. In consideration of the services rendered by Executive to the Company during his employment hereunder, Executive shall receive an annual base salary of Two Hundred and Ten Thousand Dollars ($210,000.00) during the Initial Term, payable in equal periodic installments, at least monthly, in accordance with the Company's regular payroll practices with respect to senior management compensation ("**Base Salary**"); *provided*, that such Base Salary will be prorated based upon the portion of the year Executive is employed by the Company. Executive's Base Salary shall increase to Two Hundred and Sixteen Thousand Dollars ($216,000.00) during the first Renewal Term. Executive's Base Salary shall increase to Two Hundred and Twenty-Two Thousand Dollars ($222,000.00) during the second Renewal Term. After completion of the second Renewal Term, Executive's Base Salary shall be reviewed annually by the Board or the compensation committee thereof, if any, in accordance with the compensation policies and guidelines of the Company, and may be increased as a result of such

review at the sole discretion of the Board based upon the achievement of both Company and individual objectives and goals previously set forth by the Board.

   (b) <u>Bonus</u>.

     (i) <u>Annual Bonus</u>. During Executive's employment, Executive shall be eligible for an annual bonus with respect to each fiscal year of the Company (the "**Bonus**"). The amount of the Bonus for any fiscal year will be determined based upon Sidus Group LLC's attainment of certain financial performance criteria and the achievement of individual leadership objectives and goals as reasonably determined and set forth by the Board (in consultation with the compensation committee, if any) in good faith and approved by the Board at the beginning of such fiscal year (the "**Annual Bonus Plan**")1.

     (ii) <u>Timing</u>. The Bonus for any given fiscal year shall be paid in accordance with the timing set forth in the Annual Bonus Plan for such fiscal year.

   (c) <u>Benefits</u>. During the Term, Executive and his immediate family shall be entitled to participate in any group insurance, hospitalization, medical, dental, health, accident or similar plan or program of the Company that may be in effect from time to time to the extent that he is eligible under the general provisions thereof, provided that Executive shall be required to make contributions to any such plan to the same extent as similarly situated executives are required to do so (collectively, the "**Benefits**").

   (d) <u>Vacation</u>. Executive shall be entitled to a period of annual paid vacation time of twenty (20) Business Days (as defined below) per twelve (12) month period. Unused vacation will expire twelve (12) months after the date of accrual and in no event shall Executive's total accrued vacation exceed twenty (20) Business Days. In addition, Executive shall be entitled to observe (and be paid for) such holidays as are recognized by the Company in the ordinary course. For purposes of this Agreement, the term "**Business Day**" shall mean any day except Saturday, Sunday or any day on which banks are generally not open for business in the City of New York.

   (e) <u>Reasonable Business Expenses</u>. In accordance with the Company's Travel & Entertainment policy and other generally applicable policies and practices of the Company, as administered by the SVP – Finance, Chief Financial Officer or Chief Operating Officer, Executive shall be reimbursed for reasonable out-of-pocket expenses actually incurred by the Executive in connection with the performance of his duties hereunder, including expenses incurred by Executive in connection with travel on Company business away from the Office; *provided* that Executive shall provide the Company's SVP – Finance, Chief Financial Officer or Chief Operating Officer with reasonably detailed invoices of any such expenses on a monthly basis; *provided, further*, that such expenses shall not exceed the approved annual budget for the Executive without the prior written approval of the Board.

   (f) <u>Withholding</u>. All payments made pursuant to this Agreement shall be subject to such withholding taxes as may be required by any applicable law.

---

**1**. Performance-based Bonus Plan to be provided annually.

(g)     Insurance.    Executive shall be covered by a reasonable and customary insurance policy or policies maintained by the Company providing liability insurance for directors, officers, employees, or agents or fiduciaries of the Company or of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise which such person serves at the request of the Company.

5.      Representations of Executive.

Executive represents to the Company that: (a) there are no restrictions, agreements or understandings whatsoever to which Executive is a party that would prevent, or make unlawful, his execution of this Agreement and his employment hereunder; (b) his execution of this Agreement and his employment hereunder shall not constitute a breach of any contract, agreement or understanding, oral or written, to which he is a party, or by which he is bound; (c) he has not entered into, and will not enter into, any agreement, either written or oral, in conflict herewith; and (d) he is of full capacity, free and able to execute this Agreement and to enter into this Agreement with the Company. The Company is relying on Executive's representations in entering into this Agreement.

6.      Termination.   Executive's employment hereunder may only be terminated in accordance with the provisions of this Section. In the event Executive's employment is terminated by either Executive or the Company, the following provisions shall constitute the Company's only obligations to Executive upon termination:

(a)     Termination by the Company upon Death or Disability.    In the event Executive is terminated due to his death or Disability (as defined herein), all of Executive's rights to compensation as set forth in Section 4, if any, shall immediately terminate as of the date of such termination, except that Executive (or, in the event that Executive's employment is terminated due to Executive's death, Executive's heirs, personal representative or estate) shall be entitled to any earned and unpaid portion of his Base Salary and any accrued Benefits up to the date of termination, less all deductions or offsets for amounts owed by Executive to the Company. Upon payment of the amounts specified in the immediately preceding sentence, the Company shall have no further obligations to Executive under this Agreement.

For purpose of this Section, the term "Disability" means any physical or mental illness, impairment or incapacity which prevents Executive from performing the essential functions of his job, with or without reasonable accommodations, for a period of ninety (90) consecutive days or an aggregate of one hundred eighty (180) work days in any one-year period. During any period of Disability, Executive agrees to submit to reasonable medical examinations upon the reasonable request, and at the expense, of the Company, and disclose the results of same to the Company, which results shall be maintained in confidence by the Company and shall not be disclosed by the Company other than as may be reasonably necessary to enforce the Company's rights hereunder.

(b)     Termination by the Company without Cause or by Executive for Good Reason.   The Company may terminate Executive's employment for any reason other than death, Disability or for Cause upon not less than two weeks' prior written notice to Executive. In the event the Company terminates Executive's employment for any reason other than death,

Disability or for Cause, or in the event that Executive terminates his employment for Good Reason (as defined herein), all of Executive's rights to the compensation as set forth in Section 4 shall immediately terminate as of the effective date of such termination, except that Executive shall be entitled to any earned and unpaid portion of his Base Salary, any accrued Benefits, and expense reimbursement which shall have accrued but remain unpaid through the effective date of termination, less all proper deductions or offsets for amounts owed by Executive to the Company, all of which shall be paid by the Company on the first regularly scheduled payroll date of the Company following the effective date of such termination. In addition, Executive shall receive (so long as Executive is not in breach of any provision of this Agreement) an amount equal to 100% of his then full annual Base Salary (the "**Severance Payment**"), to be payable over a period of twelve (12) months (the "**Severance Period**") and in accordance with the Company's then-existing payroll practices with respect to senior management: Notwithstanding the foregoing, Executive shall not be eligible to receive the Severance Payment unless Executive executes a release agreement in substantially the form attached hereto as Exhibit A (the "**General Release**") and such General Release is effective and no longer subject to revocation within thirty (30) days following the date of termination of Executive's employment hereunder. Executive understands that should he fail or refuse to execute the General Release, or if Executive revokes such General Release, he shall not be entitled to any Severance Payment under this Section. The first installment of Executive's Severance Payment shall be payable beginning on the first pay date next following the thirtieth (30th) day after the date of Executive's execution of the General Release, provided that the requirements with regard to the General Release have been satisfied. Upon payment of the final installment of the Severance Payment (and provided the Company shall have paid Executive all of the other sums provided for above) the Company shall have no further obligations to Executive under this Agreement.

      (c)    Termination by the Company for Cause. In the event Executive is terminated for Cause, all of Executive's rights to compensation as set forth in Section 4 of this Agreement shall immediately terminate as of the effective date of such termination, except that Executive shall be entitled to any earned and unpaid portion of his Base Salary and accrued Benefits and reimbursements which shall have accrued but remain unpaid through the effective date of termination, less all proper deductions or offsets for amounts owed by Executive to the Company, all of which shall be paid by the Company on the first regularly scheduled payroll date of the Company following the effective date of such termination. Executive shall not be entitled to any bonus, prorated or otherwise. Upon payment of the amounts specified in the first sentence hereof, the Company shall have no further obligations to Executive under this Agreement.

      (d)    Termination by Executive for other than Good Reason. If Executive desires to terminate his employment hereunder for other than Good Reason (including by electing not to renew the Term pursuant to Section 1(c) hereof), he shall first give the Company not less than sixty (60) days prior written notice of termination. The effective date of termination of Executive's employment with the Company under this Section shall be a date specified by the Company within five (5) days of its receipt of such written notice of termination, which date shall not be later than the end of such 60-day period. If Executive terminates his employment for other than Good Reason, all of his rights to compensation as set forth in Section 4, if any, shall immediately terminate as of the effective date of termination, except that

Executive shall be entitled to any earned and unpaid portion of his Base Salary, accrued Benefits and reimbursements which have accrued but remains unpaid through the effective date of termination, less all proper deductions or offsets for amounts owed by Executive to the Company, all of which shall be paid by the Company on the first regularly scheduled payroll date of the Company following the effective date of such termination, and Executive shall not be entitled to any Bonus, prorated or otherwise. Upon payment of the amounts specified in the immediately preceding sentence, the Company shall have no further obligations to Executive under this Agreement.

(e)  <u>Definition of Cause</u>.  For purposes of this Agreement, the term "**Cause**" shall mean the following:  (i) any act or omission by Executive constituting gross negligence or willful misconduct of Executive in the performance of his duties which, in the reasonable judgment of the Board, is materially injurious to the financial condition, business or reputation of the Company; (ii) Executive's material breach of any provision of this Agreement (*provided* that, except with respect to habitual or repeated breaches, if any alleged breach is capable of being cured, Executive shall not be considered in breach unless he shall have failed to cure such alleged breach within ten (10) Business Days following the delivery of written notice thereof from the Company, stating the reason for such termination for Cause); (iii) any act or omission by Executive constituting fraud, embezzlement or dishonesty against the Company; (iv) use of illegal drugs or repetitive abuse of other drugs or repetitive excess consumption of alcohol interfering with the performance of Executive's duties; and/or (v) Executive's conviction of, or plea of guilty or *nolo contendere* to, any felony or act of moral turpitude which, in the reasonable judgment of the Board, is materially injurious to the financial condition, business or reputation of the Company or any of its Affiliates.

(f)  <u>Definition of Good Reason</u>.  For purposes of this Agreement, the term "**Good Reason**" shall mean any of the following (without Executive's express consent): (i) a meaningful diminution of the authorities, duties or responsibilities of the Executive from those in effect as of the date hereof; (ii) the Executive's relocation outside the Baltimore/Washington, D.C. metropolitan area (*provided*, that Executive acknowledges that the performance of Executive's duties may require up to ninety (90) days aggregate travel per calendar year to evaluate additional business opportunities across the United States, and such travel shall not constitute Good Reason); (iii) a material reduction by the Company in the Executive's Base Salary as in effect immediately prior to such reduction; (iv) any reduction of the targeted percentage of Base Salary utilized to calculate the Bonus, other than as part of a management-wide reduction in bonuses; (v) any material breach by the Company of any provision of this Agreement or any material breach by ByteGrid Holdings of its Amended and Restated Limited Liability Company Agreement, as amended (the "**LLC Agreement**"); and/or (vi) any material breach by ByteGrid Holdings of that certain Membership Interest Purchase Agreement by and among Sidus Group, LLC, ByteGrid Holdings, and certain other parties (including Executive), dated as of March ___, 2015 (the "**MIPA**").

(g)  <u>Notice of Termination</u>.  Any termination, except for death or for termination by Executive for other than Good Reason, pursuant to this Section 6 shall be communicated by a Notice of Termination. For purposes of this Agreement, a "<u>Notice of Termination</u>" shall mean a written notice which shall indicate those specific termination provisions in this Agreement relied upon and which sets forth in reasonable detail the facts and

circumstances claimed to provide a basis for termination of the Executive's employment under the provisions so indicated.  The Notice of Termination shall also set forth that Executive's employment is terminated and be delivered in accordance with the terms of this Agreement.

   (h) <u>Recognition of No Additional Payments.</u>  Executive recognizes and accepts that, except as otherwise required under the Consolidated Omnibus Budget Reconciliation Act of 1985 or any other applicable law (the cost of compliance of which will be borne by Executive unless otherwise required by law), the Company shall not, in any case, be responsible for any additional amount, severance pay, termination pay, severance obligation or other payments or damages whatsoever arising from the termination of Executive's employment, above and beyond those specifically provided for herein; *provided*, that nothing herein shall modify, amend, limit or otherwise impair Executive's rights under the LLC Agreement to which the Executive is a party or any other separate agreement between the Company and the Executive.

   7. <u>Restrictive Covenants.</u>

   (a) <u>Non-Competition.</u>  Executive agrees that during his employment with the Company and, subject to Section 7(g), the Severance Period, as extended (the "<u>Covenant Term</u>"), he will not: (i) on his own behalf nor, directly or indirectly, as principal, agent, partner, member, shareholder, consultant, financier or employee, work for, provide consulting services to, act as a financier to, or otherwise provide services to, any person, entity, firm, corporation or business establishment in the Territory (as defined below) which competes with the Company or ByteGrid Holdings or any of their respective affiliates or subsidiaries (each individually a "<u>Company Group Member</u>" and collectively, the "<u>Company Group</u>") in the Business (as defined below); (ii) directly or indirectly, solicit, interfere, influence, hinder, hamper or impede, or seek to interfere, influence, hinder, hamper or impede existing or potential business relationships between any Company Group Member and any person, entity, customer, client or supplier having a relationship with any Company Group Member during the Covenant Term.

   For purposes of this Agreement, the term "**Business**" shall mean the business of providing scalable data center, interconnection, consulting, and professional services, including, but not limited to, wholesale and retail colocation rackspace solutions, cloud platforms and services, dedicated and managed hosting services, infrastructure services, backup and database storage solutions, disaster recovery services, and compliance and quality management services, as being conducted by the ByteGrid Holdings, the Company and any Company Group Member. The term Business shall also include any other business in which any Company Group Member were engaged or planning to be engaged during Executive's employment with the Company; *provided*, that (A) the Company can demonstrate any such Company Group Member was planning to be engaged in a business through written materials (for example, strategic plans, Board materials, minutes of Board meetings, etc.) and (B) Executive knew or should have known of such plans as a result of his employment with the Company.

   For purposes of this Agreement, the term "<u>**Territory**</u>" shall mean North America.

(b)     Non-Solicitation of Employees.  Executive agrees that during the Covenant Term, he will not, directly or indirectly, (i) solicit, cause any other person to solicit or assist any other person in soliciting, the employment of any person who is, at the time of such solicitation, or who was within thirty (30) days of such solicitation an officer or employee of the Company or any of its affiliates or subsidiaries or (ii) hire any person who was an employee of the Company or any of its affiliates or subsidiaries; *provided*, that Executive may make general solicitations for employment not specifically directed at the Company or any of its affiliates or subsidiaries or their respective employees.

(c)     Non-Solicitation of Customers.  Executive agrees that during his employment with the Company and subject to Section 7(g), for a period of two (2) years following the termination of his employment, he will not, directly or indirectly, solicit, cause any other person to solicit, or assist any other person with any Company Group Member or any potential customer or client of any Company Group Member with whom any of such parties has had discussions to become a customer or client of another entity which is in direct or indirect competition with the any Company Group Member. This subsection is limited to the extent Executive knows or should have known that such potential customer or client is, in fact, a potential customer or client.

(d)     Confidential Information.  Executive agrees at all times during and after his employment with the Company to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation, the Confidential Information of the Company Group. "**Confidential Information**" means all confidential and proprietary information or documents and trade secrets of any Company Group Member, including, but not limited to, financial information, pricing information, margins, customers (including prospective customers), suppliers (including prospective suppliers), other Business relationships, contract terms, leasing terms, billing information, asset information and components, sales and marketing strategies, Business operations and prospects, intellectual property, and any and all other Business information disclosed to Executive by any Company Group Member, either directly or indirectly, in writing or orally. Confidential Information may also include proprietary information, trade secrets or know-how received by the any Company Group Member in confidence from third parties.

Executive further agrees that all memoranda, notes, records, reports, electronic data and electronic records, letters, and other documents made, compiled, received, held, or used by Executive while employed by the Company concerning any phase of the business of the any Company Group Member and which contains Confidential Information shall be such entity's property and shall be delivered by Executive to the Company on the termination of his employment with the Company, or at any earlier time on the request of the Company. Notwithstanding the preceding provisions of this Section or any other provision of this Agreement to the contrary, Confidential Information does not and shall not include, and the restrictions upon Confidential Information imposed upon Executive hereunder shall not apply with respect to, any information that: (i) was or is already, or otherwise becomes, publically known or enters the public domain through no wrongful act or omission of Executive; (ii) was or is obtained by Executive from a third party not known by Executive to be under any obligation of confidentiality to any Company Group Member; (iii) was known to Executive prior to its

disclosure to Executive by any Company Group Member; or (iv) is authorized in writing by the Company for disclosure by Executive.

(e)    Inventions and Improvements.  Executive agrees that during his employment with the Company he will promptly communicate to the Company all ideas, discoveries and inventions which are or may be useful to any Company Group Member. Executive acknowledges that all ideas, discoveries, inventions, and improvements which are made, conceived, or reduced to practice by him and relating to the Company's Business (including Business products or projects which are under active consideration by any Company Group Member or for which any such entity has otherwise begun the planning or development) gained by him during his employment with the Company are the property of such entity, and Executive hereby irrevocably assigns all such ideas, discoveries, inventions and improvements to the Company for its sole use and benefit, without additional compensation. The provisions of this Section shall apply whether such ideas, discoveries, inventions or improvements are conceived, made, or gained by him alone or with others, whether during or after usual working hours, whether on or off the job, which is applicable to matters directly or indirectly related to the Company's Business (including Business products or projects which are under active consideration by any Company Group Member or for which the Company or any such other entities has otherwise begun the planning or development), and whether or not within the specified realm of duties. Executive shall, upon request of the Company, but at no expense to Executive, at any time during or after his employment with the Company, sign all instruments and documents reasonably requested by the Company and otherwise cooperate with the Company to protect its rights to such ideas, discoveries, inventions and improvements, including applying for, obtaining, and enforcing patents and copyrights thereon in any and all countries. The Company agrees that any claim it may have in connection with this Section 7(e) (and only this Section 7(e)) shall be asserted by the Company within one (1) year after the termination of Executive's employment with the Company.

(f)    Non-Disparagement.  Each of the Company and Executive agree to not, at any time, publish or communicate disparaging or derogatory statements or opinions about the other party or its affiliates to any third party. It shall not be a breach of this Section for Executive or any representatives of the Company to testify truthfully in any judicial, administrative or arbitration proceeding or to make statements or allegations in legal filings, depositions or responses to interrogatories that are based on Executive's or such representative's reasonable belief and are not made in bad faith.

(g)    Manner of Severance.  Notwithstanding any provision of this Agreement to the contrary, Executive's obligations under this Section 7 (other than Section 7(d)) shall terminate if the Company breaches its obligation to make any required Severance Payment or pay any other post employment compensation or benefits provided for under Section 6.

(h)    Enforceability; Remedy.  Each of the Company and Executive agrees that any breach of the covenants and agreements contained in this Section 7 will result in irreparable injury to the Company for which money damages could not adequately compensate the Company. Accordingly, the parties agree that in the event of a breach of the terms of this Section 7, in addition to and not in lieu of the Company's rights herein, including, without limitation, the Company's termination right as set forth in Section 6 hereof, the Company shall

have the right to terminate any Severance Payment Executive is otherwise entitled to and require Executive to reimburse the Company for any portion of any Severance Payment already made to Executive. The parties further agree that in the event of a breach of the terms of this Section 7, in addition to and not in lieu of the Company's rights herein, including, without limitation, the Company's termination right as set forth in Section 6 hereof, the Company shall have the right to equitable relief, including issuance of a temporary or permanent injunction by any court of competent jurisdiction against the commission or continuance of any breach of any of the aforementioned terms of this Section 7. If Executive is determined by any court of competent jurisdiction to have breached any of the covenants or agreements contained herein, then the term of such covenant or agreement shall be extended for a period of time equal to the period of such breach. The parties further agree that in the event of any breach of this Agreement by the Company for which money damages could not adequately compensate Executive, Executive shall have the right to equitable relief, including issuance of a temporary or permanent injunction by any court of competent jurisdiction against the commission or continuance of any breach of this Agreement by the Company.

(i)     Acknowledgements.  Executive expressly acknowledges that the covenants contained in this Section 7 are a material part of the consideration bargained for by the Company, and, without the agreement of Executive to be bound by such covenants, the Company would not have agreed to enter into this Agreement. Executive further acknowledges and agrees that the Business of the Company and its services are highly competitive, and that the covenants contained in this Section 7 are reasonable and necessary to protect the Company's legitimate business interests. In addition, Executive acknowledges that in the event his employment with the Company terminates, he will still be able to earn a livelihood without violating this Agreement, and that the covenants contained in this Section 7 are material conditions to his employment and continued employment with the Company.

(j)     Scope.  If a court of competent jurisdiction or arbitrator determines that the temporal or geographical limitations of any of the covenants contained in this Section 7 are not reasonably necessary to protect the legitimate business interests of the Company, then such limitations will be deemed to become and thereafter will be the maximum duration and area that such court or arbitrator deems reasonable and enforceable. The parties agree that the foregoing provision is neither intended to, nor does it, constitute or suggest an admission or belief that the covenants contained herein are unreasonable.

(k)     Definition.  For purposes of this Section 7, to act "directly or indirectly" means to act personally or through an associate, affiliate, family member or otherwise, as proprietor, partner, shareholder, director, officer, executive, agent, consultant, financier, or in any other capacity or manner whatsoever.

8.     Indemnification.  Except as otherwise required by law or by this Agreement, the Company shall indemnify and hold the Executive harmless to the fullest extent permitted by Delaware law, against any losses, liabilities, damages and expenses (including amounts paid for attorneys' fees, judgments, settlements, fines, excise taxes or penalties in connection with any threatened, pending or completed action, suit or proceeding) incurred or suffered by Executive by reason of the fact that Executive is or was serving as an employee of the Company; *provided*, that Executive shall not be indemnified for any losses, liabilities,

damages or expenses suffered that are attributable to Executive's fraud, willful misconduct or gross negligence. The Company shall pay the expenses incurred by Executive that are indemnifiable hereunder, as such expenses are incurred, in connection with any proceeding in advance of the final disposition, so long as the Company receives an undertaking by Executive to repay the full amount advanced if there is a final determination that Executive failed the applicable standards set forth above or that Executive is not entitled to indemnification as provided herein for other reasons.

9.    Section 409A.

(a)    It is the intention of the Company and the Executive that the payments, benefits and rights to which the Executive could be entitled pursuant to this Agreement comply with Section 409A of the Internal Revenue Code of 1986, as amended ("Code"), the Treasury regulations and other guidance promulgated or issued thereunder ("Section 409A"), to the extent that the requirements of Section 409A are applicable thereto, and after application of all available exemptions, including but not limited to, the "short-term deferral rule" and "involuntary separation pay plan exception" and the provisions of this Agreement shall be construed in a manner consistent with that intention. If any provision of this Agreement would cause the Executive to incur any additional tax or interest under Section 409A, Company shall, upon the specific request of the Executive, use its reasonable business efforts to in good faith reform such provision to comply with Section 409A; *provided*, that to the maximum extent practicable, the original intent and economic benefit to the Executive and the Company of the applicable provision shall be maintained, but the Company shall have no obligation to make any changes that could create any additional economic cost or loss of benefit to the Company. The Company shall not have any liability to the Executive with respect to tax obligations that result under any tax law and makes no representation with respect to the tax treatment of the payments and/or benefits provided under this Agreement. Any provision required for compliance with Section 409A that is omitted from this Agreement shall be incorporated herein by reference and shall apply retroactively, if necessary, and be deemed a part of this Agreement to the same extent as though expressly set forth herein.

(b)    With regard to any provision herein that provides for reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A, (i) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit, (ii) the amount of expenses eligible for reimbursement, or in-kind benefits, provided during any taxable year shall not affect the expense eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year, provided that the foregoing clause (ii) shall not be violated with regard to expenses reimbursed under any arrangement covered by Code Section 105(b) solely because such expenses are subject to a limit related to the period the arrangement is in effect and (iii) such payments shall be made on or before the last day of the Executive's taxable year following the taxable year in which the expense was incurred.

(c)    For purposes of applying the provisions of Section 409A to this Agreement, each separately identified amount to which the Executive is entitled under this Agreement shall be treated as a separate payment within the meaning of Section 409A. In addition, to the extent permissible under Section 409A, any series of installment payments under this Agreement shall be treated as a right to a series of separate payments.

(d)      If and to the extent required to comply with Section 409A, a termination of employment shall not be deemed to have occurred for purposes of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "Separation from Service" within the meaning of Section 409A (excluding death) and, for purposes of any provision of this Agreement, references to "termination of employment," "termination," or like terms shall mean "Separation from Service" (excluding death).

(e)      If any provision of this Agreement contravenes any applicable regulations or Treasury guidance promulgated under Code Section 409A or could cause an amount payable hereunder to be subject to the interest and penalties under Code Section 409A, the Company and the Executive agree to amend this Agreement, or take such other actions as the Company and the Executive deem necessary or appropriate, to maintain, to the maximum extent practicable, the original intent of the applicable provision without violating the provisions of Code Section 409A or the Treasury guidance thereunder.

10.      Miscellaneous.

(a)      Conflict with the MIPA.  In the event of a conflict between this Agreement and the MIPA, the terms of the MIPA shall control. Nothing in this Agreement shall limit Executive's rights to and obligations by him provided under the MIPA.

(b)      Indulgences, Etc.  Neither the failure, nor any delay, on the part of either party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same, or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

(c)      Governing Law; Dispute Resolution.  This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware without giving effect to conflict of laws or other principles. Any dispute between the parties arising under this Agreement that is not resolved by the parties within thirty (30) days after such dispute has been described in writing by one of the parties hereto to the other may thereafter be referred by either of the parties hereto for resolution in accordance with the American Arbitration Association's Commercial Arbitration Rules by a single arbitrator who is a member of a panel of the American Arbitration Association (the "AAA"), selected jointly by the Company and the Executive. In the event the Company and the Executive are unable to agree upon an arbitrator within thirty (30) days of such dispute having been referred to the AAA, the Company and the Executive shall each promptly select an arbitrator and the two arbitrators shall promptly select a third arbitrator who is a member of a panel of the AAA to resolve the dispute, who shall endeavor to resolve the dispute within ninety (90) days of the referral thereof. Any arbitration procedures shall be conducted in the Borough of Manhattan, New York County, New York. The decision of the arbitrator shall be final and binding on the Company and the Executive. The Company and the Executive shall share on an equal basis the fees payable to such arbitrator and the AAA.

(d)    Notices.  All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given, made and received only when delivered (personally, by courier service such as Federal Express, or by other messenger) or five (5) days after being deposited in the United States mails, registered or certified mail, postage prepaid, return receipt requested, addressed as set forth below:

(i)    If to Executive:

Vincent Hardick
932 Placid Court
Arnold, MD 21012

With a copy to:

Eric Wexler
200-A Monroe Street, Suite 110
Rockville, MD 20850

(ii)    If to the Company:

ByteGrid Management Services, Inc.
1800 Tysons Blvd.
Suite 350
McLean, VA 22102
Attention: General Counsel

With a copy to:

Altpoint Capital Partners LLC
712 Fifth Avenue – Suite 50
New York, NY 10019
Attention: General Counsel

Any party may alter the addresses to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section for the giving of notice.

(e)    Assignment of Agreement.  The rights and obligations of both parties under this Agreement shall inure to the benefit of and shall be binding upon their heirs, successors and assigns. This Agreement may not be assigned by Executive to a third party, nor may Executive delegate his duties under this Agreement. The Company may assign or otherwise transfer its rights under this Agreement, including, but not limited to, all covenants contained in Section 7 above, to any successor or affiliated business or corporation that acquires substantially all of the Company's business or assets ("Successor"), whether by sale of units, merger, consolidation, sale of assets or otherwise, provided that the Company requires such Successor to agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it, if no such succession had taken place. As used in this Section,

"Company" shall mean the Company as previously defined herein and any Successor which assumes and agrees to perform this Agreement by operation of law, or otherwise.

(f)     Execution in Counterparts.   This Agreement may be executed in any number of counterparts, including by facsimile, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

(g)     Provisions Separable.   The provisions of this Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.

(h)     Entire Agreement.   This Agreement, and the LLC Agreement entered into simultaneously herewith, contains the entire understanding among the parties hereto, and supersedes all prior and contemporaneous agreements and understandings between the parties, inducements or conditions, express or implied, oral or written, except as herein contained.  The express terms of this Agreement control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.  This Agreement may not be modified or amended other than by an agreement in writing.

(i)     Section Headings.   The Section headings in this Agreement are for convenience only; they form no part of this Agreement and shall not affect its interpretation.

(j)     Gender, Etc.   Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context indicates is appropriate.

(k)     Independent Review and Consultation.   Executive is hereby advised to consult with an attorney before signing this Agreement.  Executive acknowledges that it is his decision whether or not to do so.

(l)     Construction.   The parties acknowledge and agree that they each have participated in the drafting of this Agreement.  It is the intent and agreement of the parties that the language, terms and conditions of this Agreement are not to be construed in any way against or in favor of any party hereto by reason of the responsibilities in connection with the preparation of this Agreement.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement, intending to be legally bound hereby, as of the date first above written.

**BYTEGRID MANAGEMENT SERVICES, INC.**

By: _____
Name: _____
Title: _____


_____
**VINCENT HARDICK**

**Exhibit A**

**FORM OF GENERAL RELEASE**

I, Vincent Hardick, in consideration of and subject to the performance by ByteGrid Management Services, Inc., a Delaware corporation (the "**Employer**"), of its obligations under that certain Employment Agreement, dated as of _____, 2015 (as amended from time to time, the "**Agreement**"), do hereby release and forever discharge as of the date hereof the Employer and its parent companies, equityholders, sister companies, subsidiaries, affiliates and all present and former directors, officers, agents, representatives, employees, attorneys, predecessors, successors and assigns of the Employer and its affiliates and the Employer's direct or indirect owners (collectively, the "**Released Parties**") to the extent provided below. Capitalized terms used and not otherwise defined herein have the meanings set forth in the Agreement.

1. I understand that any Severance Payments paid or granted to me under Section 6(b) of the Agreement represent, in part, consideration for signing this General Release and are not salary, wages or benefits to which I was already entitled. I understand and agree that I will not receive the Severance Payments specified in Section 6(b) of the Agreement unless I execute and effectuate this General Release. Such Severance Payments will not be considered compensation for purposes of any employee benefit plan, program, policy or arrangement maintained or hereafter established by the Employer or its affiliates. I also acknowledge and represent that I have received all payments and benefits that I am entitled to receive (as of the date hereof) by virtue of any employment by the Employer.

2. Except with respect to obligations to me under the Agreement that expressly survive the termination of my employment with the Employer, my rights and obligations as an equityholder of the Company (including pursuant to the LLC Agreement to which I am a party), and any rights and obligations to me under that certain Membership Interest Purchase Agreement by and among Sidus Group, LLC, ByteGrid Holdings, and certain other parties (including me), dated as of March ___, 2015 (the "**MIPA**"), I knowingly and voluntarily (on behalf of myself, my spouse, my heirs, executors, administrators, agents and assigns, past and present) fully and forever release and discharge the Employer and the other Released Parties from any and all claims, suits, controversies, actions, causes of action, crossclaims, counterclaims, demands, debts, liens, contracts, covenants, suits, rights, obligations, expenses, judgments, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, orders and liabilities of whatever kind or nature, in law and in equity, in contract or in tort, both past and present (through the date this General Release becomes effective and enforceable) and whether known or unknown, vested or contingent, suspected, or claimed, against the Employer or any of the Released Parties which I, my spouse, or any of my heirs, executors, administrators or assigns, may have, which arise out of or are connected with my employment with, or my separation or termination from, the Employer from the beginning of time until the effective date of this General Release (including, but not limited to, any allegation, claim or violation arising under: Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967, as amended (including the Older Workers Benefit Protection Act); the Equal Pay Act of 1963, as amended; the Americans

with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Worker Adjustment Retraining and Notification Act; the Employee Retirement Income Security Act of 1974; or their state or local counterparts; or under any other federal, state or local civil or human rights law, or under any other local, state, or federal law, regulation or ordinance; or under any public policy, contract or tort, or under common law, other than claims which may not, as a matter of law, be waived; or arising under any policies, practices or procedures of the Employer; or any claim for wrongful discharge, breach of the Agreement, infliction of emotional distress, defamation; or any claim for costs, fees, or other expenses, including attorneys' fees incurred in these matters) (collectively, the "Claims").

3. I represent that I have made no assignment or transfer of any right, claim, demand, cause of action, or other matter covered by Section 2 above.

4. IN SIGNING THIS GENERAL RELEASE, I ACKNOWLEDGE AND INTEND THAT IT SHALL BE EFFECTIVE AS A BAR TO EACH AND EVERY ONE OF THE CLAIMS, DEMANDS AND CAUSES OF ACTION HEREINABOVE MENTIONED OR IMPLIED. I EXPRESSLY CONSENT THAT THIS GENERAL RELEASE SHALL BE GIVEN FULL FORCE AND EFFECT ACCORDING TO EACH AND ALL OF ITS EXPRESS TERMS AND PROVISIONS, INCLUDING THOSE RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS (NOTWITHSTANDING ANY STATE STATUTE THAT EXPRESSLY LIMITS THE EFFECTIVENESS OF A GENERAL RELEASE OF UNKNOWN, UNSUSPECTED AND UNANTICIPATED CLAIMS), IF ANY, AS WELL AS THOSE RELATING TO ANY OTHER CLAIMS HEREINABOVE MENTIONED OR IMPLIED. I ACKNOWLEDGE AND AGREE THAT THIS WAIVER IS AN ESSENTIAL AND MATERIAL TERM OF THIS GENERAL RELEASE AND THAT WITHOUT SUCH WAIVER THE EMPLOYER WOULD NOT HAVE AGREED TO THE TERMS OF THE AGREEMENT. I FURTHER AGREE THAT IN THE EVENT I SHOULD BRING A CLAIM SEEKING DAMAGES AGAINST THE EMPLOYER (OTHER THAN FOR PAYMENT OF THE AFORESAID SEVERANCE PAYMENTS, OR FOR DAMAGES ARISING UNDER OR INCIDENT TO THE LLC AGREEMENT, OR FOR DAMAGES ARISING UNDER OR INCIDENT TO THE MIPA) OR IN THE EVENT I SHOULD SEEK TO RECOVER AGAINST THE EMPLOYER IN ANY CLAIM BROUGHT BY A GOVERNMENTAL AGENCY ON MY BEHALF, THIS GENERAL RELEASE SHALL, SUBJECT TO THE EXCLUSIONS SET FORTH HEREIN, SERVE AS A COMPLETE DEFENSE TO SUCH CLAIMS AS TO MY RIGHTS AND ENTITLEMENTS. I FURTHER AGREE THAT I AM NOT AWARE OF ANY PENDING CHARGE OR COMPLAINT OF THE TYPE DESCRIBED IN SECTION 2 AS OF THE EXECUTION OF THIS GENERAL RELEASE.

5. I agree that neither this General Release, nor the furnishing of the consideration for this General Release, shall be deemed or construed at any time to be an admission or acknowledgment by the Employer, any Released Party or myself of any improper or unlawful conduct.

6. I agree that I will (a) forfeit all amounts payable by the Employer pursuant to Section 6(b) of the Agreement and (b) to the maximum extent permitted by applicable law, immediately return to the Employer all amounts paid by the Employer pursuant to Section 6(b) of the

Agreement, in each case, if I challenge the validity of this General Release. I also agree that if I violate this General Release by suing the Employer or the other Released Parties with respect to any matter released hereunder, I will pay all costs and expenses of defending against the suit incurred by the Released Parties, including reasonable attorneys' fees, and return all payments received by me pursuant to Section 6(b), as applicable, of the Agreement.

7. I agree and acknowledge that the provisions, conditions and negotiations of this General Release are confidential and agree not to disclose any information regarding the terms, conditions and negotiations of this General Release, nor transfer any copy of this General Release, communicate or disclose or otherwise refer or allude to the substance of this General Release to any person or entity, other than my immediate family and any tax, legal or other counsel I have consulted regarding the meaning or effect hereof or as required by applicable law, and I will instruct each of the foregoing not to disclose the same to anyone.

8. Any nondisclosure provision in this General Release does not prohibit or restrict me (or my attorney) from responding to any inquiry about this General Release or its underlying facts and circumstances by the Securities and Exchange Commission, the Financial Industry Regulatory Authority, any other selfregulatory organization or governmental entity.

9. Notwithstanding anything in this General Release to the contrary, this General Release shall not relinquish, diminish, or in any way affect any rights or claims arising out of any breach by the Employer or by any Released Party of the Agreement after the date hereof.

10. Whenever possible, each provision of this General Release shall be interpreted in, such manner as to be effective and valid under applicable law, but if any provision of this General Release is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this General Release shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

11. This General Release shall be governed by and construed in accordance with the laws of the State of Delaware, but without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required hereby.

BY SIGNING THIS GENERAL RELEASE, I REPRESENT AND AGREE THAT:

  (i)   I HAVE READ IT CAREFULLY;

  (ii)  I UNDERSTAND ALL OF ITS TERMS AND KNOW THAT I AM GIVING UP IMPORTANT RIGHTS, INCLUDING BUT NOT LIMITED TO, RIGHTS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, AS AMENDED;

  (iii) I VOLUNTARILY CONSENT TO EVERYTHING IN IT;

  (iv)  I HAVE BEEN ADVISED TO CONSULT WITH AN ATTORNEY BEFORE EXECUTING IT, I HAVE HAD THE OPPORTUNITY TO SO CONSULT,

AND HAVE AVAILED MYSELF OF SUCH ADVICE TO THE EXTENT I HAVE DEEMED NECESSARY TO MAKE A VOLUNTARY AND INFORMED CHOICE TO EXECUTE THIS AGREEMENT;

(v)   I HAVE HAD AT LEAST [TWENTYONE (21)/FORTYFIVE (45)] DAYS FROM THE DATE OF MY RECEIPT OF THIS RELEASE SUBSTANTIALLY IN ITS FINAL FORM ON _____ ___, 20___; [The fortyfive(45) day period is required if at least one other person is being terminated at the same time for the same reason, i.e., a reduction in force.]

(vi)   I UNDERSTAND THAT I HAVE SEVEN (7) DAYS AFTER THE EXECUTION OF THIS RELEASE TO REVOKE IT, SUCH REVOCATION TO BE RECEIVED IN WRITING BY THE EMPLOYER BY THE END OF THE SEVENTH DAY AFTER THE DATE HEREOF, AND THAT THIS RELEASE SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE REVOCATION PERIOD HAS EXPIRED;

(vii)   I HAVE SIGNED THIS GENERAL RELEASE KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE ME WITH RESPECT TO IT; AND

(viii)   I AGREE THAT THE PROVISIONS OF THIS GENERAL RELEASE MAY NOT BE AMENDED, WAIVED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE EMPLOYER AND BY ME.

DATED AS OF _____, 20_____


_____
[NAME]